**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KELLI BERTL, Personal Representative
of the Estate of LARRY BERTL,

                Plaintiff,

-vs-

CITY OF WESTLAND, et al.,

                Defendants.

_____/

CASE NO.  04-CV-75001

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER**
**(1) GRANTING SUMMARY JUDGMENT TO DEFENDANTS ARTHUR VAUGHN,**
**TONYA HILL, STEPHEN WILLIAMS, AND WAYNE COUNTY; AND**
**(2) DENYING SUMMARY JUDGMENT TO DEFENDANT RENELLA THOMAS**

Before the Court are two motions for summary judgment. Defendants Renella Thomas, R.N. filed her motion on June 21, 2007. (Doc. No. 283). Defendants Arthur Vaughn, Tonya Hill, Steven Williams, and Wayne County also filed their motion on June 21, 2007. (Doc. No. 287). Plaintiff Kelli Bertl ("Plaintiff"), personal representative of the estate of Larry Bertl, filed Responses on September 20 and 21, 2007. The Court held a motion hearing on October 24, 2007. Having considered the entire record, and for the reasons that follow, the Court GRANTS summary judgment to Defendants Vaughn, Hill, Williams, and Wayne County, and DENIES summary judgment to Defendant Thomas.

**I.     BACKGROUND**

This case arises out of Plaintiff's allegations that Defendants were deliberately indifferent to Larry Bertl's serious medical needs in their failure to recognize his life-threatening condition and failure to provide prompt medical care.

1

Prior to his death, Larry Bertl was a resident of the City of Westland, Michigan. (2d Am. Compl. ¶ 8). On or about March 1, 2004, at approximately 3:15 p.m., Bertl was arrested by Officer Jeff Cavanaugh of the Westland Police Department for driving while intoxicated. (2d Am. Compl. ¶ 21).

On March 2, 2004, at 10:29 a.m., Bertl was arraigned at the 18th District Court in Westland. (2d Am. Compl. ¶ 23). At the arraignment, Bertl advised the Court that he was supposed to be taking the medication Phenobarbitol, for alcohol withdrawal, but had not taken the medication since the previous day. (2d Am. Compl. ¶ 24). Bertl plead guilty to the offense of OUIL. (Def. Br. 2).

On March 3, 2004, Bertl was held at the 18th District Court for sentencing from 11:55 a.m. to 2:54 p.m. (2d Am. Compl. ¶ 25). The district court sentenced Bertl to forty-five days in jail, with a two day credit for time served at the Westland Jail.

Later in the day on March 3, two transport deputies from the Isabella County Sheriff's Department came to transport Bertl to the Isabella County Jail to serve his sentence. The deputies arrived at the Westland Police Department at approximately 7:37 p.m. However, within an hour of pick-up, the deputies returned to the Westland Police Department, informing the Westland officers that they believed that Bertl was acting erratically and exhibiting delusional behavior. The Isabella County deputies refused to take Bertl to their jail, since it was Isabella County Jail policy to refuse acceptance of prisoners that were in need of medical attention.

The next day, March 4, 2004, Defendants Vaughn and Hill, of the Wayne County Sheriff's Department, were assigned to transport prisoners from various municipal jails to the Wayne County Jail facilities. Their itinerary that day included picking up prisoners from the

cities of Westland, Livonia, Redford, and Dearborn and then transporting those prisoners to various Wayne County Jail facilities.

At approximately 5:09 p.m. on March 4, Vaughn and Hill arrived at the Westland Police Department to pick up prisoners, including Bertl. Upon arrival at Westland, Vaughn and Hill testified that they saw Bertl's hands "shaking" when the Westland police officers brought him out of his cell for the transfer. (Def. Br. Ex. 1, Vaughn Dep. 46; Def. Br. Ex. 2, Hill Dep. 36, 63, 69). The deputies observed that Bertl did not have a problem making his way to the transport van, but was "agitated" and was cursing at the Westland police officers. (Vaughn Dep. 56; Hill Dep. 63-64). Bertl also had a problem putting on his shoes and had to be assisted. (Vaughn Dep. 55).

Vaughn requested a medical clearance from the Westland police officers, but the Westland officer did not provide a copy. (*Id*. at 105-06). Vaughn testified that Bertl mentioned to him that he needed his pills. (*Id*. at 154). The Westland police officers told Vaughn that Bertl had "DTs," gave to Deputy Vaughn Mr. Bertl's pills, and told Vaughn that Bertl was up-to-date and not due for additional medication until later on in the day. (*Id*. at 156).

Since Wayne County Jail's policy was not to accept prisoners who required medical attention, Vaughn then telephoned his supervisor, Sergeant Cook, to see whether Wayne County would take a prisoner suffering from "DTs." (*Id*. at 48-49). Vaughn stated that the Westland Police Officer Boucher "told [him that Bertl] had been seen by their medical tech, had all his medication and everything . . . . [and that] he [was] good to go." (*Id*. at 49).[1] Upon receiving this information from Vaughn, Cook indicated to Vaughn that the Wayne County Jail would accept

---

[1]     Officer Boucher falsely told Vaughn that Bertl had taken his medication at 4:00 p.m. (Def. Br. Ex. E, Boucher Dep. 77-78).

Bertl. (*Id*. at 50, 161). Vaughn informed the Westland police officers that he would take Bertl to the nurse at the Wayne County Jail "right away." (*Id*. at 83).

Defendants submitted a video tape recording from Westland Police Department surveillance cameras documenting this entire encounter. (Def. Reply Ex. 1, DVD).

Vaughn then handcuffed Bertl and placed him in the back of the transport van, closest to the rear entrance door so that Vaughn could better check on Bertl during the various pick-ups. (*Id*. at 52, 71).

During the trip, Vaughn stated that Bertl made no indication that he needed immediate medical assistance. (*Id*. at 126). Hill remained in the transport van with the prisoners during the various stops. (Hill Dep. 87). Hill stated that she did not talk to Bertl at all during the various pick-ups. (*Id*. at 71).

The transport van then travelled to the Livonia Police Department. (Vaughn Dep. 108-09). Vaughn stated in his report that Bertl "was fine then." (*Id*. at 109). At Livonia, Vaughn picked up two male prisoners, including Robert Dodson. Dodson testified that Vaughn and Hill helped Bertl out of the transport van, so that the other prisoners could be loaded. (Pl. Br. Ex. F, Dodson Dep. 13). Dodson further noticed that Bertl appeared "groggy, somewhat okay, somewhat ill." (*Id*.). Dodson stated that he heard the Wayne County officers say that Bertl was ill or not feeling well. (*Id*.). Bertl was placed again at the back of the van, near the rear doors and near Dodson. (*Id*. at 15).

Dodson testified that Vaughn told the Livonia police officers to hurry up because Bertl was "in bad shape." (*Id*. at 35, 40). Vaughn denied making this statement. (Vaughn Dep. 167).

Dodson testified that during the transit from Livonia to Redford, Bertl was "pretty much

laying in [Dodson's] lap" and "didn't appear to be able to hold himself up[.]" (Dodson Dep. 15-16).

Vaughn and Hill next arrived at the Redford Township Police Department to pick up two additional female prisoners. (Vaughn Dep. 110-11).

On the trip from Redford to Dearborn, Dodson testified:

> Q: All right. Now, from Redford to Dearborn, how did Mr. Bertl's condition appear?
> A: He appeared to be in the same condition, but he had a hard time holding himself up, and I believe he was thrown towards the back of the van or kind of struck himself on the back of the van during take-off or acceleration.
> Q: Did he hit any part of his body on the van?
> A: He seemed to hit his head on the back door of the van.
> . . . .
> Q: From Redford to Dearborn, did any of the inmates say anything to Mr. Bertl?
> A: We were all talking to him. I was talking to him trying to get responses out of him, but he wasn't real verbal from the very beginning. He just struck me as someone that appeared to be drunk or just out of it.
> Q: And at one point in time did he respond to any of the statements made by the other inmates?
> A: Not really. Not to the best of my knowledge. I mean, I did hear him speak, but it didn't make a whole lot of sense what he was doing.

(Dodson Dep. 17:10-18, 20-25; 18:1-5).

Vaughn and Hill next came to the Dearborn Police Department, but did not pick up any prisoners, since another Wayne County unit had previously picked up prisoners from that location. (Vaughn Dep. 112). Vaughn again checked on Bertl again at that time. (*Id.* at 113). Vaughn noticed that Bertl was leaning up against another inmate in the back of the van. (*Id.* at 52). Bertl was also sweating. (*Id.* at 86). Vaughn recounted that it appeared that Bertl was going into a "deep sleep" and seemed "weaker." (*Id.* at 52, 68-69, 172). Vaughn also stated that Bertl mumbled "uh-huh" in a loud voice when Vaughn told him that they were on their way to the Wayne County Jail. (*Id.* at 174). Another prisoner in the van told Hill that Bertl had fallen off the

bench at some point. (Vaughn Dep. 52-53, 62-63; Hill Dep. 77). Dodson testified that the trip from Dearborn to the Wayne County Jail "seemed like it was pretty fast, pretty rough ride[.]" (Dodson Dep. 36).

When the van arrived at the Wayne County Jail Dickerson Facility in Hamtramck at 6:39 p.m., Vaughn assisted Bertl out of the van. (Vaughn Dep. 73; Hill Dep. 95-96). Since Bertl was having difficulty moving under his own power, Corporal Sevon assisted Vaughn in escorting Bertl to the jail registry area. (Vaughn Dep. 73). By the time the three arrived at the sliding door, Vaughn and Sevon were supporting Bertl's entire weight. (*Id*. at 74, 179-87). Vaughn stated that at this time Bertl was moaning, but he was breathing normally. (*Id*. at 75).

Vaughn testified that Corporal Sevon and he took Bertl into the registry area of the Wayne County Facility. (*Id*. at 37). Vaughn and Sevon then placed Bertl in a cell. (*Id*. at 38). Vaughn indicated that he was instructed to position Bertl on the floor in such a manner that Bertl would not choke if he vomited. (*Id*. at 38, 197-98). Vaughn further stated that Bertl was "gurgling" – or trying to talk to Vaughn – but Vaughn could not understand him. (*Id*. at 39-40).

Vaughn then talked to Sergeant Gregory Gordish at the registry desk and told him that Bertl needed medical care. (*Id*. at 41). Vaughn told Gordish that Bertl had been checked out by EMS at Westland. (Def. Br. Ex. I, Gordish Dep. 62). Gordish informed Vaughn that Gordish had already called for the nurse. (Vaughn Dep. 41). Vaughn did not hear Gordish call for medical assistance before leaving Dickerson to take the rest of the prisoners to Wayne County's downtown Detroit facility. (*Id*. at 42, 103).

Bertl died in the cell. The circumstances are discussed, *infra*.

Following Bertl's death, Detective Michael Bemis, from the Internal Affairs division of the Wayne County Sheriff's Department, interviewed witnesses at the jail in compiling a report of the incident. (Pl. Br. Ex. A, 7/14/04 Wayne County Sheriff's Department Internal Investigation Report).

Detective Terry Smiddy interviewed Officer Stephen Williams on March 4, 2004; and Bemis conducted a second interview with him on June 4, 2004. Williams told Bemis told he saw Vaughn and Sevon bring Bertl into the jail's registry at approximately 7:00 p.m.. Williams stated that Bertl was breathing but had been unresponsive when assisted into his cell. Williams then entered the cell and took Bertl's fingerprints for Bertl's mittimus commitment paperwork.

Williams indicated that Defendant Nurse Thomas was contacted to evaluate Bertl. Thomas and he walked over to Bertl's cell; but, according to Williams, Thomas never entered the cell. Williams stated that Thomas would not evaluate Bertl until he was "dressed out" in a prison uniform before taking him to the third floor clinic. Williams stated that Sergeant Gordish then ordered Williams and Officer McDaniel to "dress out" Bertl.

When Williams and McDaniel arrived at Bertl's cell, they noticed that Bertl was no longer breathing. (*Id.*). Williams told McDaniel to call the medical code. Officer Parker and Nurse Dozier commenced CPR, and an ambulance was summoned. EMT arrived and took Bertl to Detroit Receiving Hospital, where he was pronounced dead.

At his deposition, Williams stated that Bertl was still breathing when he attempted to fingerprint him. (Def. Br. Ex. 4, Williams Dep 81). Williams testified that he accompanied Thomas at least until they arrived at Bertl's cell door. (*Id.* at 24). Williams did not recall seeing Thomas in the cell, but admitted that she could have gone in when he left the area to go talk to

Sergeant Gordish at the registry. (*Id*. at 35, 34-35, 52). However, Williams confirmed that when Thomas returned to the registry area "he was under the impression [that Thomas] didn't want to see [Bertl] until he was in prison uniform." (*Id*. at 24-25).

Sergeant Gordish was interviewed by Detectives Cytresse Watson and Clara Carter-Steele at 12:20 a.m. on March 5, 2004. Gordish stated that Vaughn told him that Bertl "ha[d] DTs but that the inmate was walking fine when he was picked up at Westland."[2]

According to Gordish's interview, when Thomas arrived at the registry area, she asked Gordish about Bertl's charge. Upon learning that Bertl was being held for an alcohol-related charge, Thomas responded, "Oh, he's intoxicated." Thomas then told Gordish that Bertl needed to be booked, "dressed out," and then taken to the third-floor clinic. Gordish then asked Thomas whether Bertl's condition would allow the time to book and to dress Bertl, Thomas responded, "Yes." Gordish confirmed these details at his deposition. (Pl. Br. Ex. C, Gordish Dep. 64, 131).

On March 16, 2004, Bemis interviewed Nurse Thomas at the Dickerson Facility. Thomas was accompanied by her union president, Elizabeth Patterson.

Thomas stated that she had been assigned to the third-floor clinic at Dickerson and received a telephone call from the registry to come down and evaluate an inmate. She stated that she was the only nurse in the clinic at the time the call was received.

Thomas stated that she arrived at the registry, and Williams asked her to examine Bertl. Thomas walked over to Bertl's cell and noticed that he was not wearing shoes and that his arms and legs were moving. Thomas told Williams to find out about Bertl's history. When Williams

---

[2]     Sergeant Gordish testified at his deposition that he did not understand the nature of "delirium tremens" prior to this incident. (Gordish Dep. 35). Williams also testified that at the time of the incident, his understanding of "DTs" was "different context with different meanings." (Williams Dep. 8).

went to find out more information about Bertl, Thomas stated that she went into Bertl's cell, checked his pulse and breathing, and then exited the cell. Thomas noticed during her examination of Bertl that he had EKG contacts on his chest, leading her to believe that Bertl had received medical attention prior to coming to Dickerson. Thomas noted during the interview that Bertl's pulse was "in the sixties" and his respiration was "sixteen." Thomas told Bemis that she noted this information on a pad of paper but did not include the information in Bertl's file.

According to Thomas' interview, Williams and Gordish returned and told her that Bertl was being held for an alcohol-related charge and that he had been medically cleared at Westland.

During the interview, Thomas stated at first that it was Gordish who had insisted upon Bertl being dressed out. However, later in the interview, Thomas admitted that it was her "judgment call" to have Bertl dressed out before bringing him to the clinic.

Bemis noted that he had requested Thomas to provide the notepad upon which she had made her notations of Bertl's pulse. Bemis noted that as of the date of the report – June 14, 2004 – Thomas had not provided the notepad or the notations.

At her deposition, Thomas testified as follows on what Williams told her about Bertl's condition:

> Q:    And what did you do at that point when [Williams] came up to you?
> A:    I asked him what did he have – what did he want me to do, who did he have for me to see?
> Q:    What did he tell you?
> A:    He said that they had picked up a guy that he wanted me to check out. I can't remember his exact words. And I said, "Where is he?" He said, "He's there in the cell." I said, "What do you know about him?" He said, "Nothing." He didn't even know his name. So, we go into the cell and there were other inmates.
> . . . .
> Q:    Did you talk to Sergeant Gordish at any point in time about Mr. Bertl?
> A:    Yes.
> Q:    Did he tell you that he was in DTs?

| | |
|---|---|
| A: | No. He told me what he thought he was in. He told me what the charges were. We reviewed it because he had it on the ledger on his desk. |
| Q: | What did he tell you about Mr. Bertl's condition, if anything? |
| A: | He didn't know anything about him. He said he came in from Westland and let's find a MIDAS, I think that's what it's called, and he looked for it and he read me the content, and he said that he had been medically cleared at Westland, and he had been picked up for OUIL. |
| . . . . | |
| A: | I had no indicator whether he was in alcohol withdrawal or what he was in at the time I went into the cell. |
| Q: | You knew at some point in time that he had been arrested for drunk driving? |
| A: | Yeah, after I came out of there. |

(Thomas Dep. 90:9-19; 66:11-25; 133:12-17).

Thomas testified at her deposition that she was called down to the jail registry area to check on an inmate. When she arrived, she encountered Williams. Thomas asked Williams about the inmate who required medical attention. (Thomas Dep. 90). Thomas recounted that Williams knew the inmate in question, but could not provide his name or any other details. (*Id*.).

Thomas stated that Williams and she entered the cell together. (*Id*. at 92). Since there were other inmates in the cell, Williams escorted out the other inmates. (*Id*.). After taking the other inmates out of the cell, Williams went to find more information about Bertl. (*Id*. at 93). While Williams was out, in a span of two or three minutes, she checked Bertl's pulse and respiration, noticed the EKG pads on Bertl's chest, and observed that he was breathing. (*Id*. at 98-104). Bertl did not give any verbal response to any of Thomas' actions. (*Id*. at 105-07). Thomas wrote down some notes on a piece of paper and stuck it in her pocket. (*Id*. at 230-31).

Thomas testified that when she went into the cell, she was unaware that Bertl was suffering from alcohol withdrawal. (*Id*. at 133). Thomas stated that she returned to the registry desk, and asked Gordish about Bertl's charge. According to Thomas, Gordish told her that Bertl had been arrested for OUIL and had been medically cleared at Westland. (*Id*. at 66). Thomas

stated that Gordish and she had a "discussion" at which it was determined that Bertl needed to be "dressed out" before being transported upstairs to see the physicians at the clinic. (*Id.* at 79). Thomas did not recall Gordish asking her whether Bertl's situation required enough time to be dressed out. (*Id.* at 78-79). Thomas indicated later in her deposition that the officers told her that Bertl had to be dressed out. (*Id.* at 232). Thomas also testified that she did not indicate to the officers that Bertl needed to be dressed out and brought up "right away." (*Id.* at 79).[3]

Robert Kreitner, an inmate at Dickerson during the incident, testified that he observed Thomas entering Bertl's cell. Kreitner stated that he saw Thomas taking Bertl's pulse. (Def. Br. Ex. K, Kreitner Dep. 6). Kreitner testified that at that time, Bertl was "making weird movements with his body. His legs were jumping around. He looked like he had a seizures[.]" (*Id.*). Kreitner confirmed that Bertl appeared to be alive and breathing at that time. (*Id.*).[4]

Sergeant Gordish then ordered three deputies, including Williams, to "dress out" Bertl in order to be taken to the infirmary. (Gordish Dep. 223). When the deputies arrived at Bertl's cell, they discovered that Bertl had stopped breathing. (Wayne County Jail Records 28). The officers

---

[3]   Defendants also introduce a "progress note," purportedly written by Thomas once she returned to the clinic to show that she evaluated Bertl. (Def. Br. Ex. L, Progress Note). Detective Michael Bemis testified that during his internal investigation of this incident, Thomas showed him a note; but could not remember at his deposition if the "progress note" in the record was the same "note" Thomas showed to him during the course of the investigation. (Def. Br. Ex. M, Beamis Dep. 105-06).

      Nurse Dozier testified that she instructed Thomas not to make any notes about Bertl, since Dozier was the nurse that later responded to the code. (Def. Reply Ex. E, Dozier Dep. 32-34).

[4]   Defendants also attach an affidavit from another inmate, Jason Knott, who stated that he saw a nurse go into Bertl's cell to examine Bertl. (Def. Reply Ex. J, Knott Aff. ¶¶ 4-5). This affidavit was sworn on September 24, 2007, a few days after Plaintiff filed her Response to Defendants' motion for summary judgment.

then "called a code" to summon emergency personnel. (Gordish Dep. 302-05). Deputy Parker began performing CPR. (*Id*. at 123). The alarm was sounded, and an ambulance was requested at 7:08 p.m.

After the alarm was sounded, Nurse Dozier arrived and either "took over" or assisted Deputy Parker with the efforts to revive Bertl. (*Id*.). Immediately thereafter, Doctor Vmulpalli, Doctor Leider, and Nurse Borillo arrived to assist Bertl. (*Id*. at 109-10). The EMS arrived approximately ten minutes later and ferried Bertl to Detroit Receiving Hospital. (*Id*. at 280). Bertl was pronounced dead at the hospital at 7:36 p.m. (*Id*. at 282).

An autopsy was performed on Bertl the next day. The Wayne County medical examiner declared the cause of death as "hepatic steatosis with contributing chronic obstructive pulmonary disease." (Def. Br. Ex. 6, Wayne County Medical Examiner Report).

Plaintiff originally filed suit in Wayne County Circuit Court on November 30, 2004, claiming violations of 42 U.S.C. § 1983 and state law against the City of Westland, individual Westland defendants, Wayne County, and individual Wayne County defendants. Defendants removed the case to federal court on December 23, 2004.

On December 13, 2006, Plaintiff filed her Second Amended Complaint.

On April 11, 2007, the City of Westland and the individual Westland defendants were dismissed from the case, pursuant to a settlement agreement.

Therefore, for the purpose of Defendants' motions for summary judgment, the following claims remain against Wayne County and individual Wayne County defendants:

| | |
|---|---|
| Count I: | Gross Negligence (state law) (Thomas, Vaughn, Hill, and Williams) |
| Count IV: | 42 U.S.C. § 1983 Municipal Liability (Wayne County) |
| Count VIII: | 42 U.S.C. § 1983 Deliberate Indifference (Thomas, Vaughn, Hill, and Williams) |

All Defendants moved for summary judgment.

At the October 24, 2007 motion hearing, Plaintiff agreed to dismiss the state law gross negligence claim against all Defendants.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Under Fed. R. Civ. P. 56(b), a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*. In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial" will mandate the entry of summary

judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere

allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in

Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of

evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of

Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-

moving party must produce more than a scintilla of evidence to survive summary judgment).

"'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a

genuine issue of fact." *Id.* (citations omitted); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902

(1990).

## B. Qualified Immunity & Deliberate Indifference under 42 U.S.C. § 1983

The United States Court of Appeals for the Sixth Circuit has recently summarized the

qualified immunity analysis as it applies to § 1983 claims:

> To state a claim under 42 U.S.C. § 1983, a plaintiff must present facts sufficient to
> show that the defendants, acting under color of state law, deprived him of a specific
> right or interest secured by the Constitution or laws of the United States.
>
> . . . .
>
> Section 1983 is not itself a source of any substantive rights, but instead provides the
> means by which rights conferred elsewhere may be enforced. Our first task,
> therefore, is to identify the specific constitutional or statutory rights allegedly infringed.
>
> . . . .
>
> Qualified immunity protects officials from liability when a reasonable official in the
> defendant's position would not have understood his or her actions to violate a
> person's constitutional rights. Under the doctrine of qualified immunity, "government
> officials performing discretionary functions, generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Meals v. City of Memphis*, 493 F.3d 727-29 (6th Cir. 2007) (internal citations omitted).

A court applies the following three-step analysis for evaluating a qualified immunity defense:

First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003) (internal citations omitted). "If the plaintiff fails to establish any one of these elements, qualified immunity must be granted." *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 302 (6th Cir. 2005).

The Court must first determine initially whether the facts, in the light most favorable to Plaintiff, demonstrates a constitutional violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002). If a plaintiff can show that a defendant was deliberately indifferent to an inmate's serious medical needs, that usually satisfies the "clearly established" prong of the qualified immunity analysis. *See Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003).

The Sixth Circuit has elaborated on the nature and elements of a "deliberate indifference" claim brought under the Eighth Amendment:

The Supreme Court has adopted a mixed objective and subjective standard for ascertaining the existence of deliberate indifference in the context of the Eighth Amendment:

[A] prison official cannot be found liable under the Eighth Amendment for

15

denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

The objective component of the test requires the existence of a "sufficiently serious" medical need. A sufficiently serious medical need is predicated upon the inmate demonstrating that he or she "is incarcerated under conditions imposing a substantial risk of serious harm."

The subjective component, by contrast, requires a showing that the prison official possessed "a sufficiently culpable state of mind in denying medical care." Deliberate indifference requires a degree of culpability greater than mere negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." The prison official's state of mind must evince "deliberateness tantamount to intent to punish." "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."

*Miller v. Calhoun County*, 408 F.3d 803, 812-13 (6th Cir. 2005) (internal citations omitted).

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

The Sixth Circuit has rejected a "collective knowledge" approach to deliberate indifference claims, focusing rather upon what each individual involved actually knew about an inmate's medical situation. *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005); *Speers v. County of Berrien*, 196 Fed. Appx. 390, 394 (6th Cir. Sept, 1, 2006) (unpublished) (per curiam) ("[W]e must evaluate each defendant individually because we generally do not impute knowledge from one defendant to another").

In regards to the "objective" component of a deliberate indifference claim, the Sixth Circuit has recognized that the "sufficiently serious" medical need can be either: (1) "minor" or "non-obvious" medical needs; or (2) obvious to a lay person. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004). In the case of "minor" or "non-obvious," medical needs, a plaintiff must show that the defendant's deliberate indifference was the proximate cause of the inmate's ultimate injuries. *Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005).

However, this proximate cause showing is not required when the medical need is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d. at 898-99. In the latter case, it is sufficient that the inmate "actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id*. at 900.

The Court finds that delirium tremens is an objectively serious medical need. In an unpublished opinion, the Sixth Circuit has found that delirium tremens, as opposed to general alcohol withdrawal, is a "serious medical need." *See Speers*, 196 Fed. Appx. at 394 ("Expert testimony showed that delirium tremens, if untreated, is often fatal – which assuredly makes it a "serious" medical condition"); *see also Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) (recognizing in the Fifth Circuit that delirium tremens is a serious medical need). Additionally, Plaintiff's experts in the instant case have demonstrated that delirium tremens is a serious medical condition that can lead to death. (Pl. Br. Ex. C, Smith Dep. 69).

### 1. Defendants Vaughn & Hill

Plaintiff argues that Vaughn and Hill were aware of the seriousness of Bertl's condition, yet failed to take any action to alleviate the risk of harm. Although Plaintiff concedes that

Vaughn and Hill could have initially relied upon the Westland officer's representation that Bertl was "good to go," had been checked out by medical, and was not due for further medication until later in the day Vaughn and Hill, at some point, should have realized, "based on their own observations," that Bertl required immediate medical care, rather than waiting until the transport van returned to the Wayne County Jail. (Pl. Br. 17).

Vaughn's testimony indicates that at the time of the incident, he understood "DTs" to mean "detox," and not "delirium tremens."

> Q:  Do you have an understanding today of what the term DT's means?
> A:  Yes
> Q:  What's your understanding of what the term DT's means?
> A:  Delirium tremens.
> Q:  Do you know what delirium means?
> A:  Shaking.
> Q:  Do you know what tremens means?
> A:  Not really.
> Q:  When did you learn, first learn what DT's or delirium tremens is?
> A:  Coming to this session that y'all been having.
> Q:  When you transported Mr. Bertl back in March of 2004, did you have any understanding of what the term DT's meant?
> A:  No. My understanding was alcohol withdrawal.
> Q:  Back then, back in 2004?
> A:  Yes.

(Vaughn Dep. 15:22-25, 16:1-14).

Hill also testified that she did not know what "delirium tremens" was at the time of the incident, stating that "DTs" to her meant "alcohol withdrawal":

> Q:  Okay. What do you know about alcohol withdrawals other than they can be shaky?
> A:  That they need medical treatment.
> Q:  Anything else?
> A:  I just recently found out that they can die from it, from that.
> Q:  Anything else?
> A:  If they don't get medical treatment.

> Q:     So, before you picked up Mr. Bertl, did you know that they needed medical attention?
> A:     Yes. People going through DTs, alcohol withdrawal.
> Q:     And what did the phrase or letters DTs mean to you back in '04 when you picked up Mr. Bertl?
> A:     Alcohol withdrawal.
> Q:     Do you know what delirium tremens is?
> A:     No.

(Thomas Dep. 33:9-24).

The Sixth Circuit has previously addressed a situation where the officers interpreted the term "DTs" as "detox," rather than "delirium tremens":

> In the prison's records and during the depositions of the prison guards, many of the guards refer to [the plaintiff] as having the "DTs." While delirium tremens is a serious medical condition, which generally requires immediate hospitalization, the same is not true of general alcohol withdrawal, which typically may be managed in a prison setting and indeed frequently is managed there. Each of the guards who referred to [the plaintiff] as suffering from the "DTs" indicated that he understood the phrase to be shorthand for "alcohol withdrawal," not shorthand for the more serious condition. Because [the plaintiff] does not dispute the guards' general understanding of the phrase, a prison employee's statement that [the plaintiff] was suffering from the "DTs," without more, does not establish that the guard was aware that [the plaintiff] was suffering from a serious medical condition.

*Speers*, 196 Fed. Appx. at 395.

Defendants respond that Westland Officer Boucher failed to inform Vaughn of the following aspects of Bertl's condition: (1) that he had not slept during the previous 30 hours; (2) that he had been hallucinating and sweating; (3) that he had not taken his medications in the prescribed manner; (4) that he had not consumed food or water in the previous 30 hours; and (5) that Isabella County deputies had picked him up, then returned him to Westland because they would not accept a prisoner with an urgent medical condition.

After Boucher told Vaughn that Bertl was going through "DTs," was "good to go," and was up-to-date on his medications, Vaughn called his supervisor to check whether the Wayne

County Jail would accept him. Vaughn understood "DTs" to mean to "detox." According to Vaughn, he had experience dealing with individuals that were "detoxing" from alcohol or drugs, and knew that those suffering from "detox" required medical attention. However, Vaughn was not subjectively aware of the seriousness or immediateness of Bertl's medical situation when he picked up Bertl from Westland.

Moreover, throughout the transport to Livonia, Redford, and Dearborn, Vaughn appeared concerned about Bertl's deteriorating situation. The record demonstrates that Vaughn checked regularly on Bertl and expedited the prisoner pick-ups.

Dodson testified that during the transport van ride to Wayne County, it did not appear to him that Bertl was dying:

> A:     I didn't see an immediate need – me personally, I didn't see an immediate need that the person was dying. He was breathing. He was – he just appeared to be someone that was very bad drunk or suffering from some kind of drug addiction or just having passed out from –

(Dodson Dep. 76:14-19).

Although there is testimony that the other inmates told Vaughn about the fact that Bertl was not doing well in the back of the van, Vaughn testified that he checked on Bertl at every stop. Once Vaughn and Hill arrived at Dickerson, Vaughn immediately escorted Bertl out of the van and then helped carry him into the registry. Vaughn then informed the registry officer that Bertl needed medical attention. Vaughn then proceeded with his remaining prisoners to another Wayne County facility.

Upon these facts, the Court does not find that Plaintiff has demonstrated the subjective prong of the deliberate indifference analysis as it applies to Vaughn and Hill. From the moment that Vaughn picked up Bertl from Westland, Vaughn was informed that Bertl had been checked

out by medical and had been given his medication. Even with this information, Vaughn placed Bertl in the back of the van, so that Vaughn could check on him at each stop. Vaughn was aware that Bertl's condition was deteriorating, but was not subjectively aware of the potential life-threatening nature of delirium tremens and Bertl's previous thirty-hour experience at the Westland Police Department. According to Vaughn's testimony, he believed that Bertl was "detoxing," and, upon that belief, attempted to expedite the trip to Dickerson. Even Dodson admitted that although Bertl appeared sick, it was not evident that Bertl needed immediate emergency medical attention. As soon as the van arrived at the jail, Vaughn informed the staff of Bertl's need for medical attention.

In short, the Court does not find that Vaughn's state of mind rose to a level of "deliberateness tantamount to intent to punish." *See Miller*, 408 F.3d at 813. Here, Plaintiff is essentially arguing that Vaughn should have perceived the seriousness of Plaintiff's medical needs, but did not. Under Sixth Circuit precedent, that is insufficient to constitute an "infliction of punishment." *Id*.[5]

---

[5] Plaintiff cites two Fifth Circuit cases and one Eleventh Circuit case for the proposition that qualified immunity is not available to defendants that are aware that an inmate has delirium tremens, and do not summon timely medical assistance. While the Court agrees that delirium tremens is a "serious medical need," cases cited by Plaintiff are factually inapposite to the instant case. *See Thompson v. Upshur County, TX*, 245 F.3d 447 (5th Cir. 2001) (denying qualified immunity to a jailer who knew that the plaintiff was suffering from delirium tremens, but had instructed her subordinates not to contact her or to contact medical assistance unless the plaintiff was dying); *Lancaster v. Monroe County, AL*, 116 F.3d 1419 (11th Cir. 1997) (denying qualified immunity to jailers who were on notice from the inmate's parents that the inmate was a chronic alcoholic and would suffer seizures if not treated, and who delayed in obtaining medical care for that inmate); *Fielder v. Brosshard*, 590 F.2d 105 (5th Cir. 1979) (a pre-*Farmer* case, affirming a jury verdict finding that the defendant jailers knew that the inmate was suffering from delirium tremens and failed to provide any medical attention to the inmate, resulting in his death).

Since there is no genuine issue of material fact on the issue of whether Vaughn and Hill possessed the state of mind to support a deliberate indifference claim, the Court GRANTS summary judgment based on qualified immunity to Defendants Vaughn and Hill.

### 2. Defendant Williams

Plaintiff does not respond to Defendants' motion as it relates to Williams' liability.

The only role that Williams played in this incident was being ordered to take Bertl's fingerprints in the cell and to "dress out" Bertl for the jail clinic. Williams was not aware of Bertl's medical situation when he met Thomas at the registry. When Williams discovered that Bertl required immediate medical attention during the attempted "dress out," he alerted the officers in charge.[6]

In short, there is no evidence that Williams had the appropriate state of mind to support a deliberate indifference claim. Thus, the Court GRANTS summary judgment based on qualified immunity to Defendant Williams.

### 3. Defendant Thomas

Plaintiff contends that Thomas was deliberately indifferent when she failed to enter Bertl's cell to examine him, and then unnecessarily delayed his medical treatment by insisting that Bertl be "dressed out" in a prison uniform before he could be seen by the physicians in the upstairs clinic. Plaintiff further maintains that Thomas failed to follow Wayne County Jail

---

[6]     Even Plaintiff's expert opined that he did "not believe that Officer Williams had any particular time or involvement or role that [he] would find an adverse opinion to. [Williams] was very much at the end of the chain and certainly at the end of the life of Mr. Bertl." (Pl. Br. Ex. D, Katsaris Dep. 115).

protocols by failing to summon a medical doctor immediately when it was determined that Bertl was unresponsive.

Viewing the facts in the record in the light most favorable to Plaintiff, the Court finds that Plaintiff has established a genuine issue of material fact as to whether Thomas was deliberately indifferent to Bertl's serious medical needs. Plaintiff has introduced evidence contradicting Thomas' version of events that she entered Bertl's cell to check on him[7] and that it was Gordish who ordered that Bertl be dressed out before going to the clinic.

If Thomas did not check on Bertl, her subsequent actions in insisting upon him being dressed out further delayed medical attention. Even after learning that Bertl was in for OUIL, she did not follow jail protocol – which indicates that when a nurse discovers that an inmate is "non-responsive," it must be reported immediately to a physician the inmate's condition. (Def. Br. Ex. B, Wayne County Jail Alcohol Withdrawal Policy).

The Sixth Circuit has recognized that a "medical professional's failure to perform any of the tests that would be routinely conducted under similar circumstances rises above the level of simple negligence and can support a finding of deliberate indifference." *Tate v. Coffee County*, 48 Fed. Appx. 176, 180 (6th Cir. Oct. 4, 2002) (unpublished); *see Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001) (finding that a doctor's conduct could amount to deliberate indifference where the doctor did not review an inmate's records and failed to follow departmental policy on the medical problem at issue); *Cook v. Martin*, 148 Fed. Appx. 327, 337-38 (6th Cir. July 25, 2005) (unpublished) (holding a nurse liable for failure to complete an initial

---

[7]     In addition to Williams' statement to Bemis that Thomas refused to see Bertl unless he was dressed, Plaintiff offers the statements of inmate witnesses contained in Bemis' report.

medical screening and completion of cursory examinations of an inmate were sufficient to support a deliberate indifference claim).

The Court finds that if Thomas was called to see Bertl, yet refused to examine him, and then intentionally delayed his reception of medical treatment by the jail physicians, these actions can support Plaintiff's theory that Thomas "consciously disregarded a substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994); *see Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (holding that intentionally delaying access to medical care can constitute deliberate indifference).

Therefore, the Court DENIES summary judgment based on qualified immunity to Defendant Thomas.

### C. Municipal Liability under 42 U.S.C. § 1983

Plaintiff asserts that Wayne County should be liable under § 1983 under "failure to train" and "failure to supervise" theories.

The Sixth Circuit has stated:

> To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."

*Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citation omitted). To prove that a municipality was "deliberately indifference," a plaintiff must show that: (1) the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures; and (2) that the policies and practices directly caused the constitutional violation. *Miller*, 408 F.3d at 815. "Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove municipal

24

liability." *Id.* at 816.

The Sixth Circuit has recognized that "[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Since Defendant Thomas remains in the case, the Court must determine if Wayne County is liable under a "failure to train" or "failure to supervise" theory as it relates to her.

Plaintiff bases her argument that Wayne County failed to train its jail personnel on the fact that Thomas did not have the proper training to recognize that Bertl was suffering from life-threatening delirium tremens. (Katsaris Dep. 130-36).

The Wayne County Jail Alcohol Withdrawal Policy in question was issued on April 7, 1998. (Def. Br. Ex. B). Plaintiff does not appear to argue that the policy in question was inadequate or unreasonable. Plaintiff insists, however, that Thomas was inadequately trained or supervised in the execution of that policy.

Plaintiff does not present any evidence that there was a history of similar incidents at the Wayne County Jail, that Wayne County was on notice of defective training, or that Wayne County failed deliberately to take corrective action. Furthermore, the Supreme Court has recognized that when municipal liability is premised entirely on the circumstances of the underlying constitutional violation, a plaintiff must show that the actor in question was a municipal "policymaker." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Here, Plaintiff has neither demonstrated that Wayne County's policies were "objectively inadequate" nor that it "was deliberately indifferent to the obvious inadequacy of such policies[.]" *Miller*, 408 F.3d at 817. In short, Plaintiff has failed to support her failure to train /

failure to supervise theories with any evidence relevant to proving the elements of municipal liability.

Therefore, the Court GRANTS summary judgment to Defendant Wayne County.

**III.    CONCLUSION**

For the foregoing reasons, the Court hereby:

(1)    **DISMISSES** Plaintiff's state law gross negligence claim against all Defendants;

(2)    **GRANTS** summary judgment to Defendants Vaughn, Hill, Williams, and Wayne County (Doc. No. 287); and

(3)    **DENIES** summary judgment to Defendant Thomas (Doc. No. 283).

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 9, 2007

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 9, 2007.

s/Denise Goodine
Case Manager